541 P.2d 941

The STATE of Arizona, Appellee,

v.

Ronald DANTE, Appellant.

No. 2 CA–CR 537.

Court of Appeals of Arizona,
Division 2.

Oct. 31, 1975.

Rehearing Denied Dec. 15, 1975.

Review Denied March 9, 1976.

Robert J. Hirsh, P. C., by Robert J. Hirsh, Tucson, for appellant.

## OPINION

HATHAWAY, Judge.

Appellant, a night club hypnotist, was tried to a jury and convicted on November 8, 1974, of attempted murder of Michael Dean, a rival hypnotist in San Diego, a violation of A.R.S. §§ 13–108, 13–110, 13–451, 13–452 and 13–453. He was sentenced to a term of not less than 7 nor more than 20 years in the Arizona State Prison and appeal is taken from this judgment of conviction and sentence.

Ed Wagner, a former police officer who had become acquainted with appellant Dante, testified that Dante had approached him early in December 1973, to find someone to do a contract killing. After appellant raised the topic on subsequent occasions, Wagner became convinced that appellant was serious about the intended killing and contacted the Pima County Attorney.

Dante approached Wagner on December 28 and urged him to speed up arrangements so appellant could be covered by an alibi at the time of the killing. Pursuant to an understanding with law enforcement authorities, Wagner was to appear to proceed with the planned killing and set up a meeting between appellant and a supposed "hit man."

On December 30, Wagner, wearing hidden electronic surveillance equipment, met with Dante to discuss his introduction to the hired killer. The conversation, overheard by two Department of Public Safety agents, was taped and later transcribed. In the conversation, Dante told of his hatred for Dean and discussed plans that the killing take place while he was performing in another part of the country. Two days later, a meeting between Wagner, Dante and the pretend "hit man," Chuck Bishop, an agent for the Department of Public Safety, took place. Recorded conversations from the meeting dis-

Bruce E. Babbitt, Atty. Gen., by William J. Schafer, III, and Shirley Frondorf, Asst. Attys. Gen., Phoenix, for appellee.

closed the making of financial arrangements for the killing and supplying further information on the intended victim's personal habits. Dante stated that if he liked Bishop's work he had "two other guys I'll let you do." Dante gave Bishop $1,420 as part payment for the job.

Dante called Wagner from Los Angeles on January 6 and complained that the killing had not taken place and that he had gone to considerable expense to be far away from the scene. A recording of this conversation was also admitted into evidence.

Dennis Sisk, a night club owner from Dallas, testified that Dante had contacted him on at least five occasions to arrange the murder of Dean.

Dante took the stand and testified that he had been addicted to barbiturates for years and had no memory of the taped conversations. He denied harboring hatred for Dean.

Two psychiatrists testified for the defense as to Dante's history of drug addiction and the mental responses to be expected from his condition. After their testimony, the defense moved to interpose a defense of insanity. The motion was based upon a note found in one of the psychiatrist's files which, it was contended, now led the psychiatrist to believe that the appellant did not know right from wrong at the time of the crime. Three psychiatrists had examined Dante prior to trial and had agreed there was no basis for an insanity defense. Dante's motion to permit the insanity defense was denied.

Six questions are presented for review challenging the exclusion of psychiatric testimony, the admission of tapes and transcripts, and the giving of instructions.

I

■ Appellant first contends the court erred in not allowing psychiatrists to testify as to Dante's mental state at the time of the commission of the crime. Intoxication had been raised as a defense and the state moved in limine, prior to trial, to restrict the use of psychiatric testimony on intoxication and specific intent.

Appellant appears to complain specifically that the court erred in disallowing his experts' testimony as to his mental state—"permitting the jury to draw its own conclusion as to the defendant's mental state, unaided by expert opinion." We do not find this complaint borne out in the record. Appellant's experts were permitted to testify at length with respect to appellant's drug addiction and its effect on his ability to form an intent. It is argued that defense counsel was not permitted to ask the final and ultimate question. We need not concern ourselves with the propriety of such a question, or whether simply a factual basis therefor should be established in the expert testimony, when we note the following in the record:

> "Q. Would it be possible that somebody that has the condition you described, would say things and not have any intention of carrying out what he would say or do?
>
> MR. KNEIP: I am going to object, improper hypothetical.
>
> THE COURT: Objection overruled.
>
> THE WITNESS: Yes, it would a definite—very possible."

We are unable to follow appellant's complaint on this first point since the record reveals he obtained the testimony that he complains he was unable to pursue.

Dr. Gurland testified that the defendant was addicted to barbiturates and that an addict with his syndrome is disoriented as to "time, place, person, and purpose . . . ." The state asked a hypothetical question as to the extent of Dante's disorientation—"If that undercover police officer had driven up in a highway patrol car and in a uniform, would that same conversation have taken place?" We are unable to find any basis in the record to confirm appellant's complaint that he was improperly restricted in eliciting psychiatric testimony. The state's contention that counsel

for appellant was given wide latitude in this connection approaching a showing of diminished capacity due to addiction, deviating from the M'Naghten test which was reaffirmed in *State v. Schantz,* 98 Ariz. 200, 213, 403 P.2d 521 (1965), is borne out by the record.

## II

■ Appellant's defense was "intoxication" through drug usage. *State v. Durgin,* 110 Ariz. 250, 517 P.2d 1246 (1974). Anticipating the intoxication defense would be used beyond showing an inability to formulate a specific intent and to raise a related insanity defense, the state unsuccessfully moved for another psychiatric examination before trial. Defense counsel, vigorously opposing the motion, stated:

". . . Now, with respect to our disclosure, we're talking about experts that testify not in this matter of sanity, what they're going to testify, in effect, is this continued drug use and his state of mind. I don't believe that at least at this juncture that he would be entitled to have an expert appointed for an examination."

At the beginning of trial, October 16, 1974, it appears that all medical experts agreed there was no basis for a M'Naghten defense. Defense counsel met with his expert one day into trial on October 17, and there was no indication that he had changed his mind on the sanity question. The prosecution's efforts to obtain further reports from defense counsel at the beginning of trial were opposed with defense counsel's assurance, ". . . we have turned over all the statements of the psychiatrists . . . everything that we have in writing . . ." Fourteen days into trial, after the state had concluded its case in chief and the defense was putting on its case, defense counsel disclosed a report from Dr. Gurland dated October 7, 1974, which he had apparently just furnished defense counsel the day before. Defense counsel indicated he had been unaware of the Gurland report, although

"maybe I should have asked." The court found the nondisclosure to be in good faith and permitted the witness to testify after calling a recess to permit the state to examine the report. The report noted an improvement in the defendant's mental condition on October 7.

On the day following Gurland's testimony, defense counsel moved to introduce an insanity defense, stating that the expert had reevaluated his notes of October 7 and now felt an insanity defense was possible. The state opposed the motion and it was denied.

Appellant cites *State v. Birdsall,* 23 Ariz.App. 454, 533 P.2d 1191 (1975), arguing that preclusion was too severe. We need not, however, consider the propriety of preclusion based upon the tardiness of the attempted defense under the circumstances. We find the trial court properly denied the defense motion under the holding of *State v. Cooper,* 111 Ariz. 332, 529 P.2d 231 (1974), that voluntary intoxication will not be permitted to support the defense of insanity even if the evidence discloses that the defendant did not know the nature and quality of his acts at the time of the acts charged.

■ Appellant's attempt to establish his defense of insanity was unsupported by any offer of proof disclosing that his mental processes were impaired through prolonged or excessive drug usage independent of his condition of intoxication from the drugs. Absent such evidence, his mental disability defense stemming from drug intoxication is limited to establishing an inability to formulate the specific intent necessary to commit the crime in question, Cooper, supra; *Territory v. Davis,* 2 Ariz. 59, 10 P. 359 (1886).

■■ After trial, Dr. Gurland testified at the mitigation hearing:

"Q. [By Mr. Hirsh]: So when we are talking about you believing that this man didn't know right from wrong, that that condition would

result from longstanding drug dependency of drug addiction, right?

"A. [By Dr. Gurland] Right, correct.

Q. Am I correct?

A. Right."

The testimony came too late to serve as an offer of proof and was insufficient, in any event, since it does not identify appellant's condition as other than being under the influence of drugs, although of long duration. The expert's observation of improvement upon appellant's voluntary abstinence from drugs confirmed that appellant's condition was voluntarily imposed and voluntarily eliminated.

### III

■ Appellant contends the trial court erred in admitting a tape recording of a conversation between Wagner and Dante on December 30, 1974, because the tape contained inaudible portions and irrelevant material of a prejudicial nature. Whether a recording is sufficiently audible to be admitted into evidence is within the sound discretion of the trial court. *U. S. v. Carlson,* 423 F.2d 431 (9th Cir. 1970), cert. den. 400 U.S. 847, 91 S.Ct. 93–95, 27 L.Ed.2d 84 (1970); see *U. S. v. Knohl,* 379 F.2d 427 (2nd Cir. 1967), cert. den. 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967). See also Annot., 58 A.L.R.2d 1024 (1958), and id. later case service, Vols. 56–63 (1974); *Todisco v. U. S.,* 298 F.2d 208 (9th Cir. 1961), cert. den. 368 U.S. 989, 82 S.Ct. 602, 7 L.Ed.2d 527 (1962). Admission of partially defective recordings was dealt with in *Addison v. U. S.,* 317 F.2d 808 (5th Cir. 1963), where the court stated:

"Their principal objection is that approximately one-half of the tape was defective and the speech or conversation recorded there was not available for the trial. We agree with what was said by the Court of Appeals for the Third Circuit in *United States v. Schanerman,* 150 F.2d 941, 944, 'There would be no more valid reason for exclusion of the mechanically recorded conversations than there would be for excluding competent conversations, overheard in part, by human witnesses.' See also *Monroe v. United States,* 98 U.S.App.D.C. 228, 234 F.2d 49, where at page 55 the Court said, 'Unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy the recording is admissible, and the decision should be left to the sound discretion of the trial judge.' " 317 F.2d at 815, 816.

■ We have considered the tape in question and find that the trial court acted well within the bounds of sound discretion in its admission. *U. S. v. Kaufer,* 387 F.2d 17 (2nd Cir. 1967); *State v. Holmes,* 13 Ariz.App. 357, 476 P.2d 878 (1970). The tape was used to corroborate testimony and not as a substitute therefor. Direct testimony covered relevant matter dealt with in the inaudible portions, and the jury was not left to speculate about the inaudible parts.

■ Appellant complains that prejudicial material dealing with irrelevant matters was permitted to come in. The materials dealt with appellant's involvement in gold smuggling; his marriage to Lana Turner and his philosophy of marrying women for their money; his experience with Hollywood policemen and his involvement in activities for which he was arrested. Portions of this tape contained coarse conversation interspersed with vulgarity and profanity.

Not only is it difficult to excise from the tape the conversation complained of, since relevant conversation pertaining to the criminal act crops up through various sectors of the tape, but the court also decided that the conversation had a bearing on the intoxication defense, assisting the jury to determine appellant's mental state from the nature and tone of the conversation. We find that the trial court properly admitted the tape.

## IV

After the tape recordings were admitted into evidence, the court permitted the distribution to the jury of transcripts of three of the four taped conversations. Furnishing transcripts to aid the jury in following a tape recording has been found proper. *Lindsey v. U. S.,* 332 F.2d 688 (9th Cir. 1964); *People v. Ketchel,* 59 Cal.2d 503, 30 Cal.Rptr. 538, 381 P.2d 394 (1963); *People v. Finch,* 216 Cal.App.2d 444, 30 Cal.Rptr. 901 (1963); *People v. Albert,* 182 Cal.App. 2d 729, 6 Cal.Rptr. 473 (1960); *People v. Wojahn,* 169 Cal.App.2d 135, 337 P.2d 192 (1959).

The transcripts were furnished to the jury to read only during the actual playing of the recordings, and the transcripts did not go into the jury room. The judge instructed the jury that if there was any variance between the recordings and the transcripts, the recordings were to be followed as the best evidence.

■ Participants in the conversations, Wagner and Bishop, and a Deputy County Attorney who monitored one of the conversations, vouched for the accuracy of the transcripts. We find that sufficient foundation was established to permit the use of the transcripts without further establishing their accuracy through the testimony of the transcribers. *People v. Ketchel,* supra.

■ Appellant's complaint that a number of transcript revisions were necessary before acceptable final transcripts were available is adequately answered in the following statement by the Supreme Court of California:

"Appellants complain further that the fact that 'it took almost three days to decipher . . . an hour tape is an indication that certainly the tape was not clear.' Yet the very effort served appellants' interest in insuring the verity of the recording and in isolating material that on first hearing might be inaudible or unclear." *People v. Ketchel,* supra. 30 Cal.Rptr. at 545, 381 P.2d at 401.

Appellant has directed our attention to no substantial inaccuracy in the transcripts and we find that the trial court properly allowed their use.

## V

■ Appellant complains that the trial court erred in refusing to define the term "malice aforethought" for the jury pursuant to his requested jury instruction. The trial court gave Maricopa Recommended Jury Instruction No. 251 adequately covering this point:

"Murder is the unlawful killing of a human being with malice.

Malice may be expressed or implied. It is express when there is shown a deliberate intention unlawfully to take the life of a human being. It is implied where no considerable provacation [sic] appears."

The instruction adequately defines the crime of murder.

## VI

■ Appellant finally contends that the trial court erred in its refusal to give his requested instruction on motive. Appellant acknowledges the Arizona Supreme Court holding in *State v. Eisenstein,* 72 Ariz. 320, 235 P.2d 1011 (1951), to the effect that when the offense is clearly established, the general rule is that a "motive" instruction is unnecessary because motive is not an essential element of the crime. He attempts to distinguish *Eisenstein,* however, in view of the evidence which came in through the allegedly intended victim, apparently directed at pointing to a motive. Motive is not an element of the offense of homicide, *State v. Scott,* 104 Ariz. 345, 452 P.2d 699 (1969); *Singh v. State,* 35 Ariz. 432, 280 P. 672 (1929).

■ Appellant contends that the motive instruction was necessary to guide the jury's consideration of his mental state, arguing that if the jury found no reasonable motive for killing Dean, the crime

must have been the product of an unreasonable mind, befogged by intoxication. We find this defense theory was adequately covered by the instructions on intoxication and specific intent.

Affirmed.

HOWARD, C. J., and KRUCKER, J., concurring.